IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| VAMPIRE LABS, LLC,<br><br>        Plaintiff,<br>v.<br><br>ANKER INNOVATIONS LTD.,<br><br>        Defendant. | CIVIL ACTION NO. 1:24-cv-01378<br><br>JURY TRIAL DEMANDED |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Vampire Labs, LLC ("Vampire Labs" or "Plaintiff") hereby files its Original Complaint against Defendant Anker Innovations, Ltd. ("Defendant" or "Anker"), alleging infringement of U.S. Patent No. 8,358,103 (the "'103 Patent" or "Patent-in-Suit").

### I. PARTIES

1. Plaintiff Vampire Labs is a company organized and existing under the laws of Texas. It was founded in Austin, Texas with its principal place of business in Austin.

2. Upon information and belief, Defendant Anker Innovations Ltd. is a corporation organized and existing under the laws of Hong Kong, with a principal place of business located at Room 1318-19, Hollywood Plaza, 610 Nathan Road, Mongkok, Kowloon, Hong Kong SAR, China 518040, where it may be served with process. Upon information and belief, Defendant Anker is authorized to do business in Texas.

### II. JURISDICTION AND VENUE

3. This is an action for patent infringement which arises under the Patent Laws of the United States, in particular 35 U.S.C. §§ 271, 281, 284 and 285. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331, §1338(a).

ORIGINAL COMPLAINT

4. Upon information and belief, Defendant is subject to this Court's personal jurisdiction pursuant to due process and/or the Texas Long Arm Statute, Tex. Civ. Prac. & Rem. Code § 17.042, because (1) Defendant has done and continues to do business in Texas and the Western District of Texas; (2) Defendant has committed acts of patent infringement in the State of Texas, including inducing others to commit acts of patent infringement in Texas, and/or committing at least a portion of any other infringements alleged herein.

5. Upon information and belief, Defendant has purposefully directed its activities toward the State of Texas and purposefully availed itself of the privileges of conducting activities in the State of Texas. Plaintiff's causes of action for patent infringement arise out of and result from Defendant's contact with the State of Texas.

6. Upon information and belief, Defendant has solicited business in the State of Texas, transacted business within the State of Texas and/or attempted to derive financial benefit from residents of the State of Texas and the residents of this District, including benefits directly related to infringement of the Patents. Defendant has placed its products and/or services into the stream of commerce throughout the United States and has been actively engaged in transacting business in Texas and in the Western District of Texas.

7. Upon information and belief, Defendant, through subsidiaries or intermediaries (including distributors, retailers, resellers and others), makes, imports, ships, distributes, offers for sale, sells, uses, and advertises its products and/or services in the United States, the State of Texas, and the Western District of Texas.

8. Alternatively, to the extent Defendant's contacts with the State of Texas and this District would not support jurisdiction under the Texas long-arm statute, Defendant is subject to Federal Long-Arm Jurisdiction under Federal Rule of Civil Procedure 4(k)(2) because (1)

Plaintiff's claim arises under federal law, (2) Defendant is not subject to jurisdiction in the courts of general jurisdiction of any state within the United States, and (3) the exercise of jurisdiction satisfies due process requirements.

9. To the extent Defendant's contacts with the State of Texas and this District would not support jurisdiction under the Texas long-arm statute, Defendant lacks substantial contacts with any single state but has sufficient contacts with the United States. To the extent Defendant's contacts with the State of Texas and this District would not support jurisdiction under the Texas long-arm statute, Defendant is not subject to jurisdiction in the courts of general jurisdiction of any state within the United States.

10. The Court's exercise of personal jurisdiction over Defendant would not offend traditional notions of fair play and substantial justice because Defendant has established minimum contacts with the State of Texas or, in the alternative, the United States.

11. Venue in the Western District of Texas is proper pursuant to 28 U.S.C. § 139l (c)(3) which provides that "a Defendant not resident in the United States may be sued in any judicial district, and the joinder of such a Defendant shall be disregarded in determining where the action may be brought with respect to other Defendants."

### III. FACTUAL BACKGROUND

<u>VAMPIRE LABS</u>

12. Headquartered in Austin, Texas, Vampire Labs was founded by a team of technological innovators who share a passion for energy conservation and microprocessor design, including Mr. Jeffrey Eastlack.

13. Vampire Labs drives energy conservation technology within all electronics and has dedicated its intellectual resources to mitigating the global problem associated with vampire

energy loss. It has patented key technology for eliminating "Vampire Energy Loss" in mobile device battery chargers, external power supplies, and other internal research and developmental projects.

## PATENT-IN-SUIT

14. Vampire Labs is the owner of all right, title, and interest in and to U.S. Patent No. 8,358,103, entitled "Automatic Coupling of an Alternating Current Power Source and an Inductive Power Apparatus to Charge a Target Device Battery," with a claim of priority to July 4, 2008. The '103 Patent duly and legally issued on January 22, 2013.

15. The '103 Patent lapsed due to an unintentional failure to pay maintenance fees. Vampire Labs submitted a Petition to Accept Unintentionally Delayed Payment (37 C.F.R. 1.378(b)) on October 22, 2024. If and when that Petition is granted by the United States Patent & Trademark Office, Vampire Labs will seek future damages for the remaining life of the '103 Patent.

## TECHNICAL OVERVIEW

16. Many conventional chargers for electronic devices with rechargeable batteries such as computer mice or smartphones require a physical, wired connection between the power supply and the electronic device. Charging continued so long as the AC power source remained active, which would potentially damage the integrity of the battery over time, among other problems.

17. Wireless battery charging, on the other hand, uses electromagnetic induction to transfer power from a charging device to a target battery, for example a smartphone battery. The charging device is typically connected to an AC power source such as a standard outlet from which it draws power that is used to charge the target battery. Commercial applications of wireless inductive charging were introduced in the early 2010s following the Wireless Power Consortium's ("WPC") establishment of the first version of the Qi Standard. Wireless charging is now very

popular because it provides a number of advantages over traditional wired charging systems, including convenience, durability, and aesthetic factors.

18. One disadvantage of early inductive power charging was the problem of vampiric power loss, which occurs when an inductive charging unit continues to draw AC power even when not needed; for example, when the target battery has been fully charged (or charged up to a desired level). Since charging devices are often left unattended and unmonitored, it is common for the charging unit to remain connected to the target device long after the battery has been charged to the desired level. Thus, these systems would draw—and thereby waste—AC power for extended periods of time. As the '103 Patent explains:

> The consumption of the vampiric power may continuously occur while the inductive charging unit is coupled to the alternating current power source, and it may occur over the course of an hour, a day, and/or over a longer time period. The consumption of the vampiric power may result in an unnecessary generation of power by a power plant. Carbon pollution, nuclear waste, or other forms of pollution and waste may occur as a result of the unnecessary generation of power. In addition, the consumption of the vampiric power may incur a power cost during a peak use period, which may waste a financial resource and/or contribute to causing an insufficient supply of power.

'103 Patent, 1:51-62.

19. The inventor of the '103 Patent, Jeffrey Eastlack, developed novel solutions to mitigate vampiric power loss in these systems. He patented these inventions in the '103 Patent and also started a company called Vampire Labs to attempt to commercialize them.

20. The '103 Patent addresses vampiric power loss through methods and systems that perform automatic coupling of an AC power source and an inductive power apparatus to charge a target device battery while avoiding or at least reducing vampiric power loss. *See* '103 Patent, Abstract.

21. Figure 14 of the '103 Patent depicts one embodiment of Eastlack's inventions:



FIGURE 14

22. The claims of the '103 Patent vary in scope but claim 1 describes a combination of functionality for an inductive battery charging system. The claimed system includes at least one transformer to generate an electric current, a rectification circuit, and a voltage regulation circuit,

and it operates to i) determine when a target device (a device to be charged) is coupled to the inductive power charging system; ii) determine when the target battery is below a threshold (for example, fully charged or 80% charged); iii) automatically couple the inductive power device and the AC power source when the target battery is below the target threshold; and iv) automatically decouple the inductive power apparatus from the AC power source with a relay switch when the target threshold is observed.

23. Figure 9 of the '103 Patent is illustrative:



**FIGURE 9**

24. The Wireless Power Consortium ("WPC") published the Qi low-power specification in August 2009—over a year after the provisional giving rise to the '103 Patent was filed in July 2008.

**Defendant's Acts**

25.     Defendant manufactures, uses, sells, offers to sell, and imports into the United States a variety of consumer electronics products that provide wireless charging in compliance with the WPC Qi Specification (the "Qi Specification"), and that infringe the '103 Patent.[1] Defendant's wireless inductive charging devices that comply with the Qi Specification are referred to herein as the "Accused Systems" and their use to perform the methods claimed in the '103 Patent are referred to herein as the "Accused Methods."

26.     For example, Defendant's Anker 544 Wireless Charger, Anker PowerWave Stand, Anker Power Wave Pad, Anker 333 Wireless Charger and Anker wireless charging stations provide for inductive wireless charging in compliance with the Qi Specification. These Accused Systems meet all claim limitations of at least claim 1 of the '103 Patent and thus their manufacture, use, sale, offer for sale, and importation into the United States infringe at least claim 1. An exemplary PowerWave Stand is depicted below.

---

[1] During the six-year damages period preceding this suit, the then-current versions of the Qi Specification include versions 1.2.3, 1.3, and 2.0.





**Through-Case Charging**
PowerWave Stand supports charging through phone cases up to 5 mm thick. Please note that cases made of metal, and external attachments such as magnets, credit cards, grips, and stands will interfere with charging.

**Switch it Up**
Place horizontally to enjoy videos while charging, or go vertical for video conferencing or to use facial recognition technology.

**Superior Safety**
Certified to work flawlessly with any Qi-compatible phone, ensuring a safe charge for you and your devices.

https://www.amazon.com/Anker-Wireless-Charger-PowerWave-Qi Certified/dp/B07WFB6QMV?ref_=ast_sto_dp&th=1 .

27.     The Qi Specification is addressed to inductive battery charging systems with one or more transformers, and specifies various states associated with the protocol's phases.

ORIGINAL COMPLAINT

### 5.1.4 State diagram (informative)

Figure 34 provides a summary of the transitions between the protocol's seven phases.

**Figure 34. State diagram**



Qi Specification v 1.2.3, p. 85.

28. The Qi Specification further specifies:

(a) functionality for determining when a target device is coupled to an inductive power apparatus, including a ping phase (*see, e.g.*, Qi Specification v 1.3, Comm Protocol, p. 23; Power Delivery, p. 32);

(b) monitoring when a target device battery is below a given threshold (e.g., less than fully charged), including through transmission and receipt of communication packets

ORIGINAL COMPLAINT

between the Power Receiver and Power Transmitter (Qi Specification v 1.3, Comm Protocol, pp. 100, 105);

(c) automatically coupling the inductive power apparatus with an AC power source when the target device battery is below the threshold, including through receipt of EPT data packets (Qi Specification v 1.3, Comm Protocol, p. 105); and

(d) using a relay switch to automatically decouple the inductive power apparatus from the AC power source when the target device battery reaches a desired charging state (Qi Specification v 1.3, Comm Protocol, p. 105), including through receipt of EPT data packets and decoupling the primary coil from the AC power to stop current on a primary coil.

29. The Accused Systems solicit, monitor and act responsive to communications from the Power Receivers, such as an iPhone, to limit charging at a threshold and restart at a lower threshold.

**Blog Center**                                                                   Chargers

*iPhone Battery Life*

The charging limit plays a vital role in enhancing the longevity and well-being of your iPhone's battery. In this section, we'll explore how it works to promote battery lifespan.

## 1. Lower Charge Levels

By setting a charging limit, like 80% or 90%, you keep the battery at a lower voltage level. This helps reduce the stress on the battery during charging, minimizing the extent of the chemical reactions that contribute to degradation.

## 2. Reduced Chemical Stress

Batteries undergo chemical reactions during the charging and discharging processes. When you use battery optimization features, you reduce the amount of chemical stress that occurs, particularly at the higher and lower ends of the battery's charge. This helps preserve the battery's health and longevity.

## 3. Mitigated Heat Generation

Heat can be damaging to your iPhone's battery. Limiting the charging level reduces the amount of heat generated during the charging process, thus protecting vital components from damage or malfunction. Furthermore, this reduction in heat generation can lead to improved overall performance and extended battery life.

https://www.anker.com/blogs/cables/why-dont-my-iphone-charge-past-80

30.     Defendant also instructs customers and users of the Accused Systems regarding how to use them in a manner that infringes the claims of the '103 Patent.

31.     On information and belief, Defendant also implements contractual controls and protections in the form of license and use restrictions with their customers to preclude the unauthorized reproduction, distribution, and modification of their products.

32. Moreover, on information and belief, Defendant implements technical precautions to attempt to thwart customers who would circumvent the intended operation of Defendant's products.

### IV. PATENT INFRINGEMENT

COUNT I — INFRINGEMENT OF U.S. PATENT NO. 8,358,103

33. Vampire Labs incorporates by reference the foregoing paragraphs 1 - 32 as if fully set forth herein.

34. Anker has directly infringed at least claim 1 of the '103 Patent in this judicial district and elsewhere in the United States by, among other things, making, having made, importing, using, offering for sale, and/or selling without authority or license the claimed system and methods of the '103 Patent.

35. The infringing products include the Accused Systems – i.e., Anker's inductive charging products that comply with the Qi Specification, including, but not limited to Anker 544 Wireless Charger, Anker PowerWave Stand, Anker Power Wave Pad, Anker 333 Wireless Charger and Anker wireless charging stations. Vampire Labs alleges that each and every element is literally present in the Accused Systems. To the extent not literally present, Vampire Labs reserves the right to proceed under the doctrine of equivalents.

36. Anker's Accused Systems are inductive battery charging systems that have a connection module to determine when a target device is coupled to an inductive power apparatus; a monitoring module to determine when a target device battery is below a charging threshold while using power from a supplemental power source; an activation module to automatically couple the inductive power apparatus and an alternating current power source when a power level of the target device battery is below the charging threshold; a separation module to automatically decouple the

inductive power apparatus and the alternating current power source when a desired charging state of the target device battery is observed, wherein the separation module is comprised of a relay switch, wherein the inductive power apparatus includes at least one of a transformer to inductively generate an electric current, a rectification circuit, and a voltage regulation circuit.

37. Functional block diagrams of Power Transmitters in accordance with the Qi Specification are shown below.



Qi Specification v 1.3, Power Ref Designs, p. 23.

38. Vampire Labs has been damaged as a result of Anker's infringing conduct. Anker is thus liable to Vampire Labs in an amount that adequately compensates it for Anker's

**ORIGINAL COMPLAINT**

infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## V.   JURY DEMAND

39.   Vampire Labs demands a trial by jury of all matters to which it is entitled to trial by jury, pursuant to FED. R. CIV. P. 38 and the United States Constitution.

## VI.   PRAYER FOR RELIEF

40.   WHEREFORE, Plaintiff Vampire Labs prays for judgment and seeks relief against Defendant as follows:

a.   Judgment that one or more claims of the '103 Patent have been directly infringed, either literally and/or under the doctrine of equivalents;

b.   Award Plaintiff past and future damages together with prejudgment and post-judgment interest to compensate for the infringement by Anker of the '103 Patent in accordance with 35 U.S.C. § 284, and increase such award by up to three times the amount found or assessed in accordance with 35 U.S.C. § 284;

c.   That the Court declare this an exceptional case and award Plaintiff its reasonable attorneys' fees and costs in accordance with 35 U.S.C. § 285; and

d.   That Plaintiff be granted such other and further relief as the Court may deem just and proper under the circumstances.

ORIGINAL COMPLAINT

| | |
|---|---|
| Dated: November 12, 2024 | Respectfully submitted,<br><br>*/s/ Andrew G. DiNovo* |
| Scott L. Cole<br>Texas State Bar No. 00790481<br>**SLC TRIAL LAW, PLLC**<br>5209 Spanish Oaks Club Blvd.<br>Austin, Texas 78738<br>Telephone: (512) 201-8505<br>scott@slc-trial.com | Andrew G. DiNovo<br>Texas State Bar No. 00790594<br>Gregory S. Donahue<br>Texas State Bar No. 24012539<br>Michael D. French<br>Texas State Bar No. 24116392<br>**DiNovo Price LLP**<br>7000 N. MoPac Expressway, Suite 350<br>Austin, Texas 78731<br>Telephone: (512) 539-2626<br>Telecopier: (512) 727-6691<br>adinovo@dinovoprice.com<br>gdonahue@dinovoprice.com<br>mfrench@dinovoprice.com<br><br>ATTORNEYS FOR PLAINTIFF<br>VAMPIRE LABS, LLC |

ORIGINAL COMPLAINT

16